**UNITED STATES of America,**
**Plaintiff,**

**v.**

**Jose Andres LOPEZ–CHAMU,**
**Defendant.**

**No. SA CR 05–54 CJC.**

United States District Court,
C.D. California,
Southern Division.

June 6, 2005.

Craig M Wilke, Federal Public Defenders Office, Santa Ana, CA, for Defendant.

Jeannie M Joseph, AUSA—Office of US Attorney Asset Forfeiture Section, Santa Ana, CA, for Plaintiff.

**ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS**

CARNEY, District Judge.

**I. INTRODUCTION**

Defendant Jose Andres Lopez–Chamu is charged with three counts of illegal re-

entry following deportation in violation of 8 U.S.C. § 1326. Mr. Lopez now seeks to suppress two incriminating statements he made to agents of the Bureau of Immigration and Customs Enforcement, or its predecessor, the Immigration and Naturalization Service (collectively referred to as "ICE") in response to their questioning while he was in custody at the Anaheim, California jail on unrelated state charges. Mr. Lopez contends his statements were unlawfully obtained because he was never advised of his *Miranda* rights. The Court agrees. Incriminating statements regarding a crime made by a person in custody during the course of an interrogation are inadmissible in a subsequent criminal prosecution unless the person was advised of his *Miranda* rights prior to making the incriminating statements. Mr. Lopez was not so advised. Accordingly, such incriminating statements were not "voluntary" as determined by the United States Supreme Court in *Miranda v. Arizona* and its progeny.

## II. RELEVANT BACKGROUND

■ On March 16, 2005, Mr. Lopez was indicted by a grand jury with three counts of illegal re-entry into the United States following deportation in violation of 8 U.S.C. § 1326. The elements the government must prove to establish a violation of § 1326 are: (1) the defendant is an alien; (2) the defendant was arrested and deported or excluded and deported; and (3) thereafter, the defendant improperly entered, or attempted to enter, the United States. *United States v. Ortiz–Lopez,* 24 F.3d 53, 55 (9th Cir.1994) (*citing United States v. Meza–Soria,* 935 F.2d 166, 168 (9th Cir.1991)). In order to establish the elements of its case, the government intends to introduce into evidence statements made by Mr. Lopez to ICE agents on February 27, 2004 and September 3, 2004.

On February 27, 2004, Agent Troy Kennedy of ICE interviewed Mr. Lopez while Mr. Lopez was in the custody of California officials in Anaheim jail on non-immigration related state charges. During the interview, Mr. Lopez admitted to being illegally present in the United States without being properly admitted or paroled in the United States. The Form I–213 ("Record of Deportable/Inadmissible Alien"), completed by Agent Kennedy as part of the interview, listed the location of the interview as Anaheim Jail and in the section regarding "immigration record" noted "SEE CIS: PRIOR DEPORT." In the "distribution" portion of the form, it stated "G875 CRIMINAL ALIEN/AGGRAVATED FELON." During this interview, Mr. Lopez was not provided *Miranda* warnings.

ICE officials also interviewed Mr. Lopez on September 3, 2004 while he was in the custody of the Anaheim jail on non-immigration related state charges. This interview, conducted by ICE agent Julio Cesar Barajas, resulted in the completion of another Form I–213. The "bond justification" portion of the form includes the following notation: "CRIMINAL ALIEN, PRIOR DEPORT." According to Agent Barajas' notes on the Form I–213, "[d]uring an oral interview, the subject freely and voluntarily made the following statements: (1) Subject admitted that his [sic] is a citizen and national of Mexico. [sic] (2) Subject admitted to not possessing the proper documentation needed to be in the United States." Agent Barajas did not administer *Miranda* warnings prior to conducting the interview.

Following his indictment, on April 29, 2005 Mr. Lopez moved to suppress any and all statements he made to ICE agents absent a showing by the government that the ICE agents advised Mr. Lopez of his *Miranda* rights, that Mr. Lopez knowingly

and intelligently waived these rights, and that the statements were made voluntarily.

## III. LEGAL ANALYSIS

### A. THE *MIRANDA* WARNINGS: GENERAL OBLIGATIONS WHEN THERE IS A CUSTODIAL INTERROGATION

The Fifth Amendment of the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." Based on this prohibition against self-incrimination, the Supreme Court in *Miranda* held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Among these procedural safeguards is the requirement that, prior to interrogation, a defendant be given the following warnings:

> That he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Id.* at 479, 86 S.Ct. 1602. A principle purpose of providing *Miranda* warnings is to permit an individual to make an intelligent decision as to whether to answer a government agent's questions. *United States v. Solano–Godines*, 120 F.3d 957, 961 (9th Cir.1997) (*quoting Trias–Hernandez v. I.N.S.*, 528 F.2d 366, 368 (9th Cir. 1975)).

▮ When a Court is faced with determining whether *Miranda* warnings were required in a given situation, the central inquiry is whether the statement of the defendant was made in the course of a "custodial interrogation." Stated differently, only if an interview by a government official constitutes a "custodial interrogation" are *Miranda* warnings obligatory. In analyzing the application of *Miranda*, a person is in custody when, evaluating all the circumstances surrounding the interrogation, there was a " 'formal arrest or restraint upon freedom of movement' of the degree associated with a formal arrest." *Stansbury v. California*, 511 U.S. 318, 322, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994) (*per curiam*) (internal citations omitted). The determination of custody "depends on the objective circumstances of the interrogation" (*Id.* at 323, 114 S.Ct. 1526) and is evaluated based on how a reasonable man in the defendant's position would have understood his situation (*Id.* at 324, 114 S.Ct. 1526 (*quoting Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984))). The test for determining when questioning is an "interrogation" is "whether 'under all the circumstances involved in a given case, the questions are reasonably likely to elicit an incriminating response from the suspect.' " *United States v. Mata–Abundiz*, 717 F.2d 1277, 1278–1279 (9th Cir.1983) (*quoting United States v. Booth*, 669 F.2d 1231, 1237 (9th Cir.1981) (*quoting Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980))).

### B. THE *MIRANDA* WARNINGS IN THE IMMIGRATION CONTEXT

▮ The Ninth Circuit has held that "[c]ivil as well as criminal interrogation of in-custody defendants by INS investigators should generally be accompanied by the *Miranda* warnings." *Id.* at 1279. Of course, in the immigration setting, like in all other contexts, the application of *Miranda* turns on whether there was an "interrogation" within the meaning of *Miranda*. "If an INS investigator has no reason to suspect that the question asked

is likely to elicit an incriminating response, there is no interrogation and, therefore, no *Miranda* violation." *Id.* In contrast, "in-custody questioning by INS investigators **must** be preceded by *Miranda* warnings, if the questioning is reasonably likely to elicit an incriminating response." *Id.* at 1280 (emphasis added).

Relying on the above principles, the Ninth Circuit has found questioning by an immigration judge during a deportation hearing admissible despite the lack of *Miranda* warnings prior to the hearing. *Solano–Godines*, 120 F.3d at 962. In *Solano–Godines*, the defendant was tried for one count of a violation of 8 U.S.C. § 1326(b). *Id.* at 959. His conviction was based in part on statements made by the defendant during a prior deportation hearing. Two years prior to the § 1326 charge, the defendant had appeared at a deportation hearing before an immigration judge. *Id.* In response to the immigration judge's questions, the defendant made statements regarding his place of birth, citizenship, prior convictions, and prior deportations. *Id.* The defendant was not provided *Miranda* warnings at the deportation hearing. The Ninth Circuit affirmed the district court's denial of defendant's motion to suppress the statements made at the deportation hearing for lack of *Miranda* warnings. Citing to *Mata–Abundiz*, the Court reasoned that any questions asked by the judge during the deportation hearing were not likely to elicit an incriminating response: "[t]he immigration judge could not be expected to anticipate that two years later Solano would illegally reenter the United States and that his responses to questions at his civil deportation hearing might incriminate him in a prosecution for this future crime." *Id.* at 962. Accordingly, the Court ruled there was no interrogation and therefore *Miranda* did not apply.

Similarly, in *United States v. Salgado* the Ninth Circuit relied on the test laid out in *Mata–Abundiz* to determine whether an interview of a defendant by an INS agent constituted an "interrogation" within the meaning of *Miranda*. *United States v. Salgado*, 292 F.3d 1169, 1172 (9th Cir. 2002), *cert. denied*, 537 U.S. 1011, 123 S.Ct. 479, 154 L.Ed.2d 413 (2002). In *Salgado*, an INS agent interviewed the defendant while he was housed at an Orange County jail facility on unrelated state weapons charges. *Id.* at 1171. The purpose of the interview was to determine if the defendant was subject to an administrative action for deportation following his release from state custody. *Id.* After interviewing the defendant without providing *Miranda* warnings, the INS agent completed a Form I–213, determined that the defendant had an A–File (an immigration file maintained by the INS on aliens), and placed the form in it. *Id.* Following his release from state custody, the defendant was deported to Mexico. *Id.* Later, the defendant was again arrested and booked into the Orange County jail. *Id.* Subsequent to this booking, a second INS agent reviewed the defendant's A-file, which disclosed five records of deportable alien and one warrant of removal/deportation indicating that the defendant had been deported previously. *Id.* The second agent sought an interview of the defendant, who at this time was in INS custody. *Id.* at 1171–1172. At the onset of the interview, the agent gave the defendant *Miranda* warnings and the defendant invoked his right to counsel. *Id.* The defendant was arrested and indicted for a violation of 8 U.S.C. § 1326. In the course of his prosecution, the defendant sought to suppress the statements made to the first INS agent due to the failure to provide *Miranda* warnings. *Id.* at 1172. The district court denied the motion, finding the INS

agent could not have reasonably anticipated the future incriminating quality of the statements that she had elicited. *Id.* The Ninth Circuit, evaluating whether under all the circumstances the questioning was reasonably likely to elicit an incriminating response, affirmed the district court's decision. As stated by the Court, "the district court found that Lundgren could not reasonably anticipate the future incriminating quality of the statements that she elicited, and we are not firmly convinced this is wrong." *Id.* at 1173. The Court found significant that "Lundgren was an INS agent handling civil immigration matters; her inquiries of Salgado were routine. Although the interview occurred at the jail, it was solely for the purpose of determining whether Salgado was deportable when he got out of jail. Lundgren had **no reason** to believe that Salgado's statements would be incriminating." *Id.* at 1172 (emphasis added). The Court likened the agent to the immigration judge in *Solano–Godines,* who could not anticipate and had no reason to know that the statements made by the defendant would become incriminating at some point in the future. *Id.* at 1173. As stated by the Court, "in neither case could the questioner have reasonably suspected that the question was likely to elicit an incriminating response. In each, the response became incriminating only after the passage of a substantial period of time and after the defendant had been deported, had illegally reentered the country, and had been arrested on state charges unrelated to his immigration status." *Id.* at 1174. The Court reaffirmed the rule from *Mata–Abundiz:* " 'if an INS investigator has no reason to suspect that the question asked is likely to elicit an incriminating response, there is no interrogation and therefore, no *Miranda* violation.' " *Id.* (*quoting Mata–Abundiz,* 717 F.2d at 1279).

## C. THE FEBRUARY 2004 AND SEPTEMBER 2004 INTERROGATIONS SHOULD HAVE BEEN PRECEDED BY MIRANDA WARNINGS

The interviews of Mr. Lopez conducted by ICE agents on February 27, 2004 and September 3, 2004 clearly were "custodial interrogations" within the meaning of *Miranda.* Therefore, the ICE agents were obligated to give Mr. Lopez his *Miranda* warnings prior to any questioning. Because Mr. Lopez's incriminating statements were given without the required *Miranda* warnings, his statements must be suppressed. Unwarned statements may not be used as evidence in the prosecution's case-in-chief. *Dickerson v. United States,* 530 U.S. 428, 443–444, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000).

### 1. MR. LOPEZ WAS IN CUSTODY

■ The Court first must consider whether Mr. Lopez was in custody for purposes of determining whether there was a "custodial interrogation" requiring the issuance of *Miranda* warnings. The Supreme Court has held that *Miranda* warnings apply to questioning which takes place in a prison setting during a defendant's term of imprisonment on a separate offense. *See Mathis v. United States,* 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968). Here, Mr. Lopez was clearly "in custody" at the Anaheim Jail for unrelated state charges when he was interviewed by ICE agents in both February and September 2004. As a state prisoner, Mr. Lopez was not free to leave and there was a clear restraint on his freedom of movement.

### 2. THE QUESTIONING BY ICE AGENTS CONSTITUTED INTERROGATIONS

The real dispute in this matter centers on whether Mr. Lopez was "interrogated"

within the meaning of *Miranda* during the February and September 2004 interviews. As outlined above, the central inquiry is whether, under all the circumstances, Agents Kennedy and Barajas had a reason to suspect the questions asked were likely to elicit an incriminating response. The Court concludes Agents Kennedy and Barajas had reason to suspect their questions would elicit such responses.

■ When Agent Kennedy questioned Mr. Lopez at the Anaheim Jail on February 27, 2004, Agent Kennedy knew Mr. Lopez had previously been deported from the United States. Agent Kennedy also was aware that Mr. Lopez had previously been convicted of a felony. Officer Kennedy's knowledge of these two facts is reflected in the Form I–213, which includes the notations "G875 CRIMINAL ALIEN/AGGRAVATED FELON" and "SEE CIS: PRIOR DEPORT." Additionally, as an ICE agent, Agent Kennedy was or should have been aware that Mr. Lopez could be criminally prosecuted pursuant to 8 U.S.C. § 1326 for re-entering the United States following a deportation and felony conviction. In light of the foregoing, Agent Kennedy knew or should have known his questions regarding Mr. Lopez's nationality and citizenship would elicit responses that **were incriminating at the time the statements were made**. Stated differently, from the moment Agent Kennedy questioned Mr. Lopez, he knew his questions could elicit incriminating responses, and from the moment the answers were uttered by Mr. Lopez, Mr. Lopez opened himself up to criminal liability. This is precisely the type of situation that compels the issuance of *Miranda* warnings as procedural safeguards.

Agent Kennedy's interrogation of Mr. Lopez is very different than the questioning found not to require *Miranda* warnings in *Salgado*. In *Salgado,* the Court concluded the INS agent who questioned the defendant had "no reason" to believe the statements made by the defendant during the interview would become incriminating in the future and therefore *Miranda* was inapplicable. The Court focused on the fact that when he made the statements to the INS agent, the defendant had not yet re-entered the United States, and therefore had not yet violated § 1326. The agent in *Salgado* could not foresee that, in the future, the defendant would do so. Here, in contrast, the statements made by Mr. Lopez were incriminating at the very moment they were made— no time needed to have elapsed and no further conduct was required on his part for potential criminal liability to be imposed. Unlike in *Salgado* (and *Solano–Godines* ), the interviewers were not required to anticipate the future incriminating quality of the questions asked and answers given. Rather, Agent Kennedy's questioning of Mr. Lopez is more akin to the interrogation of the defendant by the second agent in *Salgado*. The second INS agent in *Salgado,* after reviewing the defendant's A-file and seeing his prior deportations, administered the *Miranda* warnings prior to interrogating the defendant. This is what should have occurred here. Unfortunately, it did not.

■ With respect to the September 3, 2004 interrogation of Mr. Lopez, Agent Barajas had even more reason to know his questions would elicit incriminating responses. By the time of this interview, Mr. Lopez had already been deported from the United States following the February 27, 2004 interview. Agent Barajas' knowledge of Mr. Lopez's deportation history is reflected in the I–213 Form, which recommends no bond for Mr. Lopez with the following justification: "CRIMINAL ALIEN, PRIOR DEPORT." Agent Barajas' written statement on the Form I–213, in which he writes that Mr. Lopez "freely

and voluntarily" made his statements, indicates that Agent Barajas was aware that his questions elicited incriminating responses, that there might be doubts as to their voluntary nature, and that they might be used in a criminal prosecution of Mr. Lopez. Indeed, following the September 3, 2004 interrogation, Mr. Lopez was criminally prosecuted rather than deported. In any event, Agent Barajas' own handwritten notations on the I–213 Form reveal that he clearly knew his questions would elicit incriminating responses from Mr. Lopez. As a consequence, Agent Barajas should have advised Mr. Lopez of his *Miranda* rights.

## IV. CONCLUSION

In light of the foregoing, Defendant's motion to suppress the statements made by Mr. Lopez at the February and September 2004 ICE interrogations is GRANTED.